Case number 19-6243. Gregory Atkins et al versus Tony Parker et al. Arguments not to exceed 15 minutes per side. Mr. Wall, you may proceed for the appellants. Thank you. May it please the court. Michael Wall on behalf of the appellants, Gregory Atkins, Christopher Gouge, Kevin Proffitt, and Thomas Rollins Jr. The plaintiffs and class members are inmates in Tennessee prisons who have not received treatment for their chronic hepatitis C. They have an Eighth Amendment claim for deliberate indifference to their serious medical need, and we are asking the court to reverse the judgment entered for the defendant, Dr. Williams, after a bench trial. The claim has two components. I'll start with the objective component. Everyone in this case agrees that chronic hepatitis C is a serious, even deadly disease that spreads from one person to another. The parties actually stipulated before trial, this is Record Entry 219, that all of the named plaintiffs and class members have a serious medical need, which is really the core issue in the objective component. The district court, though, also, the district court accepted that stipulation, but went ahead and made an independent finding based on the medical evidence that all of the plaintiffs and class members have a serious medical condition. And I don't think it's really disputed also that these people have not been treated. The only form of drug treatment or treatment period for chronic hepatitis C are these new drugs. When I say new, they were actually introduced in 2011, newer drugs called direct acting antivirals. And as the district court found, none of the class members have gotten V. A. A. S. So what we have here is really undisputed facts established that all of these people have a serious medical need and that they haven't received drug treatment. The defendant is arguing that while they are getting monitoring, they go to this chronic care clinic and people see them, and that's good enough under the Eighth Amendment. And the point we're making about that is that monitoring somebody's disease in and of itself with nothing more is not any kind of treatment. What they do is they go and find out what genotype or what strain, if you will, of hepatitis an inmate has. They find out how badly his or her liver is scarred from hepatitis. That's useful information, but only if you're going to take the next step and actually treat somebody. That might tell you which of the different kinds of V. A. S. To use or how long of regimen to give. But if they're not treating people, then the monitoring doesn't do anything for the inmate. And that was the testimony of our medical expert, Dr. Yal, the only medical expert deemed credible and qualified by the district court because it certainly doesn't cure the disease and it doesn't slow it down or alleviate it either. So monitoring is that the policy because of limited resources for staffing is understandable. And I'm curious, I was going to ask both sides this question. How do cost considerations come into play in purposes of examining an Eighth Amendment claim? Because I mean, I recognize that the trial record suggests that the costs have been reduced tremendously over the years, but it struck me that it was quite expensive, at least at the outset. And so I'm curious, does it come into the subjective component? Does it come into the objective component? Is your view that it doesn't come in at all? So if treatment costs a million dollars per patient, you got to pay a million dollars. How does that go into play in determining whether you've been deliberately indifferent? Cost could come into play in a deliberate indifference claim in a couple ways. I'm listening. I'll be right there. Go ahead. Okay. One way that the objective standard is designed is to say we only look at serious medical needs. And part of the rationale for that is, you know, we don't want to force prisons into spending money on treatment for constitutional reasons if it's even serious. So that's one way that's taken care of. But this court held in DARA that if we can establish that the person does have a serious medical need, and that's undisputed here, and there's only one effective drug treatment, then cost really cannot be considered because there's only one option. What if the only effective treatment is treatment that's in, say, it's out of the country? Does the bureau that, so cost considerations, does the bureau or the Tennessee Bureau of Corrections have to fly the inmate to France to get the most cost effect or the best treatment? If that's the only, if the records show that that was the only cost or only palatable treatment for the type of disease? I realize there has to be some limiting principle, and I don't think that that's really been articulated clearly. There could be some extreme unusual circumstance where it's so difficult or burdensome to provide a treatment that there has to be a limit somewhere. I don't think that line has really been identified, and I respectfully would suggest that even though I wouldn't call these drugs cheap, an average $17,000 for a course of treatment, they're nowhere close to that extreme example because, well, for several reasons. First of all, it's a lot cheaper than treating somebody for $17,000. The cost models, when done in the academic world, would suggest that just treating everybody ends up being cheaper in the long run for that precise reason, the fact that you're not spending all the money trying to figure out how bad is this person scarring because it doesn't matter if you're treating everyone. So... Mr. Wall, if along the same lines, if I may ask, I mean, there's somebody talking in the background and some somewhere, so if we can stop that, that'd be great. Mr. Wall, the remaining claim is against Dr. Williams, personally. It's not against the state of Tennessee for failing to appropriate sufficient resources to this very serious problem. It's not like the TennCare litigation that we had where the state just wasn't funding it enough. This is a claim about this particular doctor. And I guess, and as I understand it, the question here is whether going kind of right now and going forward, prospectively rather than retrospectively, is he deliberately indifferent? And when he is spending every penny, as he put it, that he is given by the legislature on these drugs to treat as many of these people as he can, and he's making his best medical judgment, which really wasn't disputed by Dr. Yao as to which patients should get the drug with these limited funds, how is that delivered indifference on Dr. Williams' part? So I would first say that I think a court has to judge Dr. Williams' state of mind as well as what's likely to happen in the future based on what's been happening for years up until the point of trial. That's a lot more reliable, and that's why we have a trial, it's a lot more projections. So that's the first point I would make. Funding has never, according to Dr. Williams, has never really been the problem. He testified that Commissioner Parker never told us no when we asked him for money. They just never asked for it until we sued them and we got very close to trial. And a lot of things unusual happen very close to trial, and I mean a month before the or that Dr. Williams was acting, that these actions to which you're referring were taken to manipulate the litigation. I mean he said it was coincidentally, I didn't really read that as sarcastic. Perhaps that's just my reading of it and it could be read different ways. I thought it was tongue-in-cheek because the litigation had been going on for so long and nothing had changed. People still weren't getting treated, and then coincidentally, you know, a month before we had the trial, now people are going through the the committee at a rapid rate. It seemed tongue-in-cheek. Okay, but I guess, you know, my bottom line question remains, and frankly, it's my biggest concern about your position in this appeal. When Dr. Williams is spending every penny, when whatever might have happened in the past, he has obtained much more funding through, I guess, his own lobbying efforts. How can we say that this doctor, contrary to the findings of the district court, was deliberately indifferent towards this problem? Well, I'd say, first of all, funding was not really the problem because, you know, they weren't treating people and they weren't asking. I mean there's nothing in the record that shows he had a kind of a blank check in the event that he wanted to get more money. I mean, Mr. Parker doesn't appropriate funds. The Tennessee legislature does, as it seems from the record here, based on the actions, you know, more recently. And, I mean, the idea that he had some unlimited ability to obtain a drug that cost 30-something thousand dollars per treatment regimen, I don't see that in the record, and I guess Judge Crenshaw didn't either. Well, I would say the first time he asked for this kind of money, he got one big lump sum right before the trial. The first time he asked for it, he got it. And he said that Commissioner Parker, who kind of takes that up the chain to make the request for appropriation, had never said no to us for money. So what we know now is they have a lot more money. We have no idea how they've actually spent that or if they've spent that. And they're allowed to spend it over any then, you know, they're losing 10 inmates per year on average who are dying because of the disease. So if there's no time limit and no hard requirement or expectation, it's just do what you feel is right, then there's really not a lot of protection. I understand the courts don't want to manage a prison. I completely understand that. But there has to be some kind of hard, concrete expectation or really, you know, the Eighth Amendment doesn't have an impact. And in this case, what we're looking at is a situation where, you know, you have at least 100 inmates who've died from this while they had a simple cure at hand. What specific relief are you requesting us? What relief are you looking for from us? What specific? We're not asking this court to fashion the injunction or declaration. And the reason for that is already a year has passed since we had the trial. So what we think the court ought to do is say, you know, based on this evidence, we have proven that that he has shown at the time of trial deliberate indifference and then remanded to the district court to consider the circumstances and what ought to happen. There's, I think, a range of options that the very best for the prisoners and the one they would prefer probably is a universal treatment. But I think there are impact in the prison system and ameliorate this very big problem without going quite that far. So we're asking for a remand on that. Very well. Thank you, Mr. Wall. You'll have your rebuttal. We'll hear from I don't have the gentleman's name in front of me. I apologize. Good morning, your honors. For the record, I am James Newsome of the Memphis Office of the Tennessee Attorney General on behalf of Tennessee Department of Correction, Chief Medical Officer and Medical Director Dr. Kenneth Williams. To pick up, Judge Kethledge, on a point that you made, we, we do agree that trial court was in a position where it was going to and required to evaluate the 2019 guidance that Dr. Williams had put together and to evaluate the care that was given to hepatitis C infected patients going on a going forward basis. And we would submit that on this record, there is no showing of objective or subjective deliberate indifference on the part of Dr. Williams. Mr. Wall referred to the fact that, that when Dr. Williams made a request for funding, that the legislature responded and the amount is impressive. He has $31 million of funds available with which to address DA, to purchase DAAs in the current fiscal year at his request. But the record does not reflect that Dr. Williams made no previous requests for funding. As a matter of fact, the prior levels of funding were approximately $4.6 million annually. But Dr. Williams did request that additional funds be provided in order for care to be provided to the inmates who were infected with hepatitis C. Can I ask you what your position is on, on just generally how costs come into play in determining this type of deliberate indifference claim? What if, what if the legislature, I know you suggest that the costs being provided by the legislature were sufficient, but what if the legislature just responded by saying, we just, we don't think this is a serious disease, so we're not going to figure out what the correct legal principles should be in the context of this type of claim, which clearly it's a claim where the government has a duty to provide something. Unlike generally, it's the government doesn't have a duty as it's defensive. But, but how much, like how much does the government have a duty to provide and how do we go about determining that? When all is said and done, Judge Murphy, the constitution requires that adequate care be provided for inmates, not the gold standard of care or the best care possible. Judge Posner, in a Seventh Circuit opinion from 1999, which is cited on page 40 of our brief, Ralston versus McGovern said that the civilized minimum of public concern for the health of prisoners is a function of both objective need and of cost. The lower the cost, the less need has to be shown, but the need must still be shown to be substantial. Now, one, one measure would, might be that what is available for a person on, in the outside world, that there is nothing that plaintiffs have put in the record that indicates that, that such a universal provision of DAAs to F0s and F1s in the outside world is provided. One might ask, is there a case out there in which a medical provider in the outside world has been sued for failure to treat at F0 and F1? We don't think that there is, Your Honor. Mr. Newsom, if I could just, if I could interrupt, I apologize for interrupting you, but I kind of want to circle back to what I think Judge Murphy's question was, which is that what limiting principle is there on the idea that this, that a state actor or perhaps the state itself can escape liability on deliberate indifference grounds in these sorts of situations regarding prisoner medical care? How, what, to what extent can they escape liability simply by not appropriating funds for the medical care? So we're not talking about adequate versus gold standard. Hypothetically, let's say the Tennessee legislature says, we're not going to fund DAA, DAAs at all anymore. And you're just going to have to do the best you can with whatever else is out there. And then someone in Dr. Williams' position is sort of, you know, has to deal with that. Would the law, you know, provide some kind of remedy for that situation? Or does the principle that you're, you're arguing just sort of lead to these crazy results? Well, Your Honor, I would say a couple of things in response to that. First of all, as you pointed out earlier in your questioning, Dr. Williams is the defendant here. Dr. Williams does not have the ability to go to the legislature and say that it costs a million dollars to treat inmate X. Therefore, I have to have that amount of money. His deliberate indifference is not to be measured by the fact that he has failed to do that. The Constitution does not require him to do that. I think that one thing... So what happens then? Is it okay? Or is the state potentially liable for not appropriating money? Well, Your Honor, I think that sovereign immunity would apply in your hypothetical. But fortunately... Not if they're violating the Constitution. Let's just assume. Let's assume. Well, let's assume, you know, that the ex parte Young and Edelman would allow prospective injunctive relief to the effect that you've got to give adequate medical care, even if that's EAA. So let's assume there's no sovereign immunity issue. Yes, because I mean, frankly, your argument is worrisome. If the hypothetical that I described, and I think Judge Murphy was alluding to, goes without a remedy here. If, you know, the state's way out is just don't appropriate any money, and you don't have to worry about any of this. Well, I think that for the federal, one limiting principle I think that applies is that the Eighth Amendment prohibits unusual punishments. One would have to find that failure to provide the specific care that is an issue is unusual in nature as measured by what is provided in the community by other states. Let's say, for instance, to take your example, that Georgia says we do not wish to purchase DAAs for treatment of people in our prisons, yet another state does. Then certainly that would be a way that the court could look at that and say one state is providing that care, yet another is not. And so the constitutional minima have been violated under those circumstances. But it's not hypothetical to think that there may be drug therapies in the world today, that cost $1 million, $2 million for an individual. And so in those circumstances, the court is, of course, gives deference to the medical judgment of medical professionals. And under the circumstances, you would have to look and see what sort of reaction is the perhaps the insurance companies are balking and not paying those amounts. So all of those are limiting principles, which under the circumstances could circumscribe the court's ability to order or direct that a medical director provide that care, Your Honor. Can I ask you just briefly about the scope of the judgment? Would you agree? And I'm just curious on your views. This was a class action, I assume a B2 class action. So the court rejected the facial challenge to the Tennessee protocol. What's your position on whether that would foreclose an as-applied challenge by somebody who's in the class who maybe later develops chronic F4s or something to that effect? Would that person be able to assert an as-applied Eighth Amendment claim? Or would you think that this judgment forecloses that? I think, Your Honor, with regard to the care that has been given to the persons within this class pursuant to the protocol, that that has been found to be constitutionally, according to the district court, that that has been found to be constitutionally adequate. But there's always the circumstance that an individual, and we're not in that circumstance, but if an individual came in and said, there are facts here that show that Dr. Williams failed to meet his protocols. I was an F4. I was tested, evaluated. I was passed over by the committee and was denied DAA treatment. In that circumstance, there would be a potential monetary claim, I would think, under 1983, an individual. But we think that the district court's judgment should be affirmed on both the objective and the subjective deliberate indifference analysis. And that under these circumstances, as long as the department and Dr. Williams specifically has conformed to the protocol that is out there, Your Honor, we think that that would foreclose a challenge later by an individual defendant, Your Honor. The facts are approximately 1400 inmates at the time of trial with F3 or F4, right? Yes, Your Honor. I'm looking at finding a fact six that says, as of July 16, 2019, TDOC has prescribed DAAs for approximately 450 inmates, approximately 10% of the known number of inmates with chronic HCV. Well, if that's so, why isn't that alone proof of deliberate indifference? If he's only prescribing for 10% of those who are in the most chronic position, and even as of the 2015 guidance, you were supposed to prioritize for F3s and F4s. What's your answer to that? Well, Your Honor, I would say that we agree with what Judge Kethledge remarked earlier, that the protocol was to be evaluated on a prospective basis, and that there are in place, and I'm not addressing past practices, that Dr. Williams testified that the protocol is a result of a continuous process of evaluation and improvement. And Dr. Williams also testified you referred to the 1,400 patients who are F4s, for instance, at the present time. He said that all of those individuals he anticipated would be treated within the current year. Now, that means that those people are candidates for immediate treatment, and Dr. Williams testified at trial, and the trial court found him to be credible that every penny of that $31 million that is presently available for the treatment of VAAs is going to be used to that purpose. Now, an individual would have to show Judge Gilman that he had suffered some damage as a result of the delay, but there is nothing in the record that shows that any of the plaintiffs, members of the class, have suffered damage or increased injury as a result of any delay that they may have experienced. Will you say that? Dr. Yower, in his report, say that waiting to treat patients until they reach F3 and F4 increases their risk of death by a factor of two to five, isn't that in the record? Yes, Your Honor, and we acknowledge that. We acknowledge that persons who are F3 and F4 individuals should be prioritized for treatment, but really the controversy in this case is whether those who are F0s and F1s require treatment, and we submit that they do not require immediate treatment. We do submit that they have received, that they continually receive consideration for treatment. I see my time is almost up. Your Honor, we would submit that the court should affirm the judgment below and find in favor of Dr. Williams. Do you have any additional questions for me, or have I finished your questioning, Judge Gilman? Well, I'm okay. All right. Thank you, sir. Okay, Mr. Newsom, thank you for your argument, and we will hear rebuttal from Mr. Wall. Thank you. This case is not about delay in treatment. These thousands of inmates in the class have not gotten treatment at all, so as far as they're concerned, this is about treatment or no treatment, and it's undisputed that the only treatment for this disease is DAAs, which they haven't gotten, so that is, I think, a non sequitur. And actually, the statistics are worse than you alluded to, Judge Gilman. The district court found it was about 450 people treated, but in fact, if you look at what the citation was, it doesn't support that. There's a list from TDOC that we got in Discovery. The real number is 331, and the number of people infected is actually higher than what the district court cited. I'm not faulting the district court. It's just that TDOC hadn't tested everybody, so it only knew for sure that it had 4,700 infections and almost 1,400 F3s and F4s, but that number is actually bigger by some degree, so it's really not just not a good track record. It's a very bad track record, and these people who are in F3 and F4 especially are in a very serious situation, and I understand that he's gotten a lot more money, and that's a good thing, but the question is, should the courts just trust that he's going to do everything with that money that he's required to do by the Eighth Amendment? Is he going to spend it in a reasonable time frame? Is he going to use it for the drugs themselves and not computer programs or committees and things like that? All of that has to be taken as an assumption if the courts are going to say, we can't do anything about this. But there's not a whiff of evidence or any finding by the district court that would support a no answer to any of these questions. To the contrary, it seems like he's doing everything he can with what he has. The idea that he's going to ask for this money for this purpose and not spend it seems to have no basis in the record, frankly. Well, I guess I'll cite back to the, I think it's the Hoffer v. Inch case in Florida. It's a district court case, but it does have a very similar situation, and what the court said was you have to have a deadline because this is a progressive disease and it's a communicable disease. And that's why we're in the situation we're in now. The number of inmates infected has gone up year after year. They had reports showing that the number of deaths keep climbing. It's not just a question of treating it, but when you treat it. And if you treat it too late, as Judge Gilman said, you can get rid of the virus, but the person is still going to have cirrhosis. It's still going to have some irreversible damage. So time is a really way, based on the record, for a court to assume what TDOC is going to do with its money and in what time frame. That would be purely an assumption. Going back to what was discussed about appropriations, we can't sue the legislature directly to get it to appropriate money. All the courts can do is, in a case against an official like Dr. Williams, say what the under the law, we've clearly shown based on the evidence at the time of trial, which is the only way to decide these things, that Dr. Williams for years had shown deliberate indifference to this very conceitedly serious medical need. In a situation where you have thousands of people at the end stages of the disease and only 300 treated over 11 years when they had the cure, that's a pretty telling indicator of the state of mind. It's not that Dr. Williams means them harm, it's just that there's no sense of urgency about this. No sense that this is killing people and needs to have a real response in a short time frame. We think that's what a court ought to do, is put some limitations on this, put some concrete expectations. We think the record supports that. Let me ask you real quick, is the guidance that was updated from the 2015 guidance, was that before the court or did that come after the September 30, 2019 decision in this case? Did which guidance come after what? I'm sorry, I don't understand. The AASLD guidance, the judge refers to the 2015 guidance, but the guidance has been updated. It's eliminated the table that said give priority to F3 and F4s and just treat everybody you can, right? Are you aware of that? Well, I know that guidance has been updated. I'm not sure exactly when they updated the society's guidance, so I'm not sure I can give an exact date for that. I mean, we found a reference in the record, my clerk did, of November 6 of last year, but we're not sure if that's when the guidance came out or that was before then. But I mean, neither of you in your brief cited the update of the guidance. I can go look for that issue and if I find a clear answer, I can certainly file something to alert the court. I apologize, I'm not sure about the dates of the updates. If you would check on that, I would appreciate it. Very well, thank you both for your arguments. The case will be submitted.